LAURA ASARO,                 )
                                    )
               Plaintiff,     )
                                      )
             v.                 )         No.  4:13CV2165 DDN
                                      )
CAROLYN W. COLVIN, Acting     )
Commissioner of Social Security,     )
                                      )
               Defendant.    )

## MEMORANDUM

Plaintiff Laura Asaro brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying her application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). Because the Commissioner's final decision is not supported by substantial evidence on the record as a whole, it is reversed.

## I. Procedural History

On January 24, 2011, plaintiff applied for SSI claiming she became disabled on May 31, 2009, because of depression, heart conditions, lumps in the breast, high cholesterol, anxiety, and high blood pressure. (Tr. 111-16, 169.) On initial consideration, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 52, 56-60.) A hearing was held before an administrative law judge (ALJ) on June 21, 2012, at which plaintiff and a vocational expert testified. (Tr. 27-45.) The ALJ issued a decision denying plaintiff's claim for benefits on July 25, 2012, finding plaintiff able to perform work as it exists in significant numbers in the national economy. (Tr. 8-22.) On August 28, 2013, the Appeals Council denied plaintiff's request to review the ALJ's decision. (Tr. 1-5.) The ALJ's decision stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing specifically that the ALJ

erred in discounting the opinion of her treating psychiatrist, Dr. Desai. Plaintiff also contends that the ALJ's determination of her residual functional capacity (RFC) is not supported by any medical evidence of record and that the ALJ failed to cite any evidence to support his RFC findings. Plaintiff requests that the final decision be reversed and that she be awarded benefits, or that the matter be remanded for further proceedings. For the following reasons, the matter will be remanded for further consideration.

## II. Testimonial Evidence Before the ALJ

A.     Plaintiff's Testimony

At the hearing on June 21, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-four years of age. Plaintiff is a high school graduate. (Tr. 29.) Plaintiff stands five feet, four inches tall and weighs 170 pounds. (Tr. 33.) Plaintiff lives in an apartment with her boyfriend. (Tr. 40.)

Plaintiff testified that she previously worked full time at fast food restaurants, performing work as a cashier and cook. (Tr. 29-30.) Plaintiff testified that she was fired from her last job at McDonald's because she could not perform closing duties on account of chest pain. (Tr. 32.) Plaintiff testified that she last worked from August 2011 to May 2012, part-time in a school cafeteria. (Tr. 29-31.) Plaintiff testified that such work ended because the school year ended and also because of difficulties performing her duties. When plaintiff left this employment, she was working from 6:30 a.m. to 1:30 p.m. with a thirty-minute break. Plaintiff testified that she was uncertain whether she would be physically or emotionally able to return to this work in the fall. (Tr. 31.)

Plaintiff testified that she could not work full time in the school cafeteria because of depression. Plaintiff testified that she was affected by the meanness of her coworkers and the children and sometimes had to leave her duty station to call and talk to her case worker in order to calm down or to take medication. Plaintiff testified that she did not like to take medication while at work because it made her confused and interrupted her job performance. (Tr. 35.) Plaintiff testified that she had approximately ten meltdowns at work during the school year but that some coworkers recognized that she had a problem and would let her sit for a while. (Tr. 37.) Plaintiff also testified, however, that working sometimes took her mind off of her problems

such that she did not experience problems with depression or anxiety while working. (Tr. 33.)

Plaintiff testified that her depression causes her to be afraid of everything. She does not like to be out in public and is fearful in crowds. Plaintiff testified that she is afraid to leave her home, fearing that something will happen. Plaintiff is also afraid she will be unable to work, causing her to become homeless again. Plaintiff testified that she does not drive because of her fear of being in an accident. Plaintiff testified that she must be with someone while shopping and does not feel safe otherwise. (Tr. 35, 41-42.)

Plaintiff testified that she experiences depression every day and paces between her bed and couch. Plaintiff testified that she has panic and/or anxiety attacks when she thinks about her situation or is confronted with her emotions. Plaintiff testified that she cries during such episodes and gets angry and short of breath. Plaintiff also experiences chest pain during such episodes for which she takes nitroglycerine and then calls for an ambulance. Plaintiff testified that she has experienced such attacks while at work. (Tr. 36-37.) Plaintiff testified that her doctor has diagnosed her with bipolar disorder. (Tr. 39-40.)

Plaintiff testified that she has a short attention span and her mind wanders. Plaintiff testified that her children need to touch her when talking to her in order to get her attention. Plaintiff has difficulty following directions, staying focused while reading, and remembering things. (Tr. 37.) She does not watch television because of her inability to focus. (Tr. 41.)

Plaintiff testified that her heart races and she experiences chest pain when she is upset, nervous, or anxious. Plaintiff had stent placement in 2004 and currently takes medication for high cholesterol. (Tr. 33-35.) Plaintiff testified that her heart continues to race and that such condition has been attributed to an aggravated nerve around the stent for which an ablation has been suggested. Plaintiff testified that her episodes of a racing heart last from fifteen to twenty minutes and that medication given at the hospital relieves the symptoms. Plaintiff testified that she has had one- or two-day stays at the hospital and has been told at discharge that the condition is related to her anxiety disorder. (Tr. 38.)

Plaintiff testified that she also has pain in her feet, which makes it difficult sometimes to get out of bed. (Tr. 34.) Plaintiff testified that she walks on her tiptoes because of the pain she experiences when the bottom of her feet touch the floor. Plaintiff testified that she can stand for about fifteen minutes but cannot do much walking. (Tr. 38-39.)

Plaintiff testified that she takes medication for her conditions and experiences no side

effects. (Tr. 39.)

Plaintiff testified that she has worked with a case manager for about a year from whom she receives help in obtaining services from the community, such as food pantry assistance and getting to doctor's appointments. Plaintiff testified that she also calls her case manager when she is having a meltdown. Plaintiff testified that her mother lives nearby and visits two or three times a week, during which time she cooks for plaintiff. Plaintiff testified that she otherwise cooks quick, microwavable meals. (Tr. 40-41.)

B.      Vocational Expert Testimony

Dr. John McGowan, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

The ALJ asked Dr. McGowan to consider an individual of plaintiff's age, education, and past work experience and who could

> lift and carry 20 pounds occasionally, 10 pounds frequently, requires a sit/stand option, which she can change positions at will. Can occasionally climb stairs and ramps, never ropes, ladders and scaffolds. Can occasionally stoop, crouch and kneel. Should avoid concentrated exposure to unprotected heights. In addition, this hypothetical claimant is able to understand, remember and carry out at least simple instructions and non-detailed tasks. Can adapt to routine, simple work changes and can perform work at a normal pace without production quotas.

(Tr. 42-43.) Dr. McGowan testified that the sit/stand option would prevent the performance of plaintiff's past relevant work as a fast food worker but that other work could be performed, such as school bus monitor, of which 1,020 such jobs exist in the State of Missouri and 79,280 nationally; and children's attendant, of which 810 such jobs exist in the State of Missouri and 21,400 nationally. (Tr. 43.)

Counsel then asked Dr. McGowan to consider the same individual, but that she was also limited to less than occasional contact with the general public, supervisors, and coworkers. Dr. McGowan testified that such a person could not perform the jobs to which he previously testified. Counsel then asked Dr. McGowan to assume the individual would be off task for an average of five to ten minutes every hour, to which Dr. McGowan testified that such a person would probably be let go if such behavior happened regularly. (Tr. 44-45.)

### III. Medical Evidence Before the ALJ

On July 9, 2010, plaintiff was admitted to the emergency room at St. Alexius Hospital with complaints of intermittent heart palpitations. It was noted that plaintiff had been admitted earlier that same date with the same complaint but left without evaluation. An ECG from her earlier admittance was abnormal in that it showed septal infarct. Plaintiff's current symptoms resolved prior to her arrival at the emergency room. Plaintiff reported that she had medication to take daily for the palpitations but was not compliant. Physical examination was normal. Plaintiff was diagnosed with cardiac rhythm disturbance and was prescribed Atenolol.[1] Plaintiff was instructed to take her medication and to follow up with a doctor within one week. (Tr. 279-88, 296-99.)

Plaintiff was admitted to the emergency room at St. Louis University (SLU) Hospital on July 20, 2010, with complaints of a sudden onset of chest pain associated with dizziness, shortness of breath, and lightheadedness. Plaintiff reported in the emergency room that she had not experienced similar symptoms in the past. The current pain resolved while plaintiff was in the emergency room. Plaintiff reported having previously had a myocardial infarction in 2004 with stent placement. Plaintiff's current medications were noted to be nitroglycerin and aspirin. Examination was unremarkable. Results of ECG testing were normal. (Tr. 220-26, 252-53.)

Plaintiff was admitted to the hospital for this episode of chest pain. Upon admission, plaintiff reported that she had similar symptoms two weeks prior for which she went to St. Alexius Hospital and was prescribed Atenolol and Metoprolol.[2] Plaintiff also reported having numbness and pain in her hands. Plaintiff's history of anxiety was noted. Chest x-rays showed minimal right pleural effusion versus pleural thickening. Repeat ECG testing showed mild regurgitation, sinus bradycardia, and findings consistent with mild pulmonary hypertension. Plaintiff was diagnosed with chest pain, non-cardiac; coronary artery disease; and hyperlipidemia. Plaintiff was discharged to home on July 21 with instructions to see an outpatient physician. (Tr. 227-51, 254-55.)

Plaintiff was admitted to the emergency room at St. Alexius Hospital on July 31, 2010.

---

[1] Atenolol is used to treat high blood pressure and to prevent angina. *Medline Plus* (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684031.html>.

[2] Metoprolol is used to treat high blood pressure and to prevent angina. *Medline Plus* (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html>.

ECG testing in the ambulance on the way to the hospital yielded normal results. Plaintiff was noted as stable in the emergency room. She left without being seen. (Tr. 272-78.)

During an admission to St. Alexius Hospital in October 2010 for complaints of abdominal pain, plaintiff was noted as stable from a cardiac standpoint. (Tr. 321-22.)

On November 1, 2010, plaintiff was transported by ambulance to SLU Hospital with complaints of chest pain. It was noted that EMS personnel treated plaintiff for supraventricular tachycardia (SVT) while in transit to the hospital, and plaintiff's symptoms resolved. Given plaintiff's multiple hospital admissions for SVT, an ablation procedure was offered but plaintiff declined because of lack of insurance. Physical examination was normal. Chest x-rays were normal. An ECG showed septal infarct. An echocardiogram showed mild regurgitation and abnormal left ventricular systolic function with mild hypokinesis. (Tr. 334-64.) Plaintiff returned to the SLU Hospital emergency room on November 23, 2010, with complaints of fast heartbeat. Examination was normal. ECG was unchanged from prior studies. Plaintiff's symptoms resolved and she was discharged in stable condition. Plaintiff's diagnosis upon discharge was paroxysmal SVT. (Tr. 329-33.)

Plaintiff was admitted to the emergency room at St. Alexius Hospital on January 6, 2011, with complaints of a sudden onset of chest pain and intermittent palpitations. Plaintiff's symptoms resolved in the emergency room. Plaintiff was noted as mildly anxious. Physical examination was normal. ECG testing showed no change from previous studies. Plaintiff was discharged that same date in improved condition and with a diagnosis of anxiety disorder. (Tr. 458-69.)

Plaintiff visited Dr. Vani Pachalla at Grace Hill Neighborhood Health Services (Grace Hill) the following day and reported having recurrent palpitations. Plaintiff also reported feeling depressed and being unable to sleep. Plaintiff's current medications were noted to include Tylenol-3, Naproxen,[3] Metoprolol, nitroglycerin, and aspirin. Physical examination was normal. Plaintiff was diagnosed with benign hypertension, coronary atherosclerosis, paroxysmal SVT, and anxiety. Plaintiff's medications were refilled, and she was prescribed Valium[4] and Lipitor.

---

[3] Naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by arthritis conditions and joint pain caused by inflammation. *Medline Plus* (last revised July 15, 2014) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html>.

[4] Valium is used to relieve anxiety, muscle spasms, and seizures. *Medline Plus* (last reviewed

(Tr. 370-72.)

Plaintiff was transported by ambulance to the emergency room at St. Alexius Hospital on February 15, 2011, with complaints of chest pain and shortness of breath. Plaintiff's symptoms resolved in the emergency room and she left against medical advice. (Tr. 443-57.)

On February 25, 2011, Robert Cottone, Ph.D., a psychological consultant for disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's anxiety caused mild limitations in activities of daily living and in maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration. (Tr. 381-91.) In a Mental RFC Assessment completed that same date, Dr. Cottone opined that, in the domain of Understanding and Memory, plaintiff was moderately limited in her ability to understand and remember detailed instructions, but was otherwise not significantly limited. In the domain of Sustained Concentration and Persistence, Dr. Cottone opined that plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. In the domain of Social Interaction, Dr. Cottone opined that plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but was otherwise not significantly limited. In the domain of Adaptation, Dr. Cottone opined that plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting but was otherwise not significantly limited. Dr. Cottone concluded that plaintiff was capable of simple work with low stress and changes in routine environment. (Tr. 392-94.)

On March 22, 2011, plaintiff visited Dr. Joseph Ruwitch, a cardiologist at St. Louis ConnectCare, for evaluation of SVT, stent placement, chest pain, and shortness of breath. Plaintiff's current medications were noted to include Lipitor, Metoprolol, nitroglycerine, and Trazodone.[5] Plaintiff reported having had stents placed in 2004, having panic attacks for two

Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.html>.

[5] Trazodone is used to treat depression. *Medline Plus* (last revised Jan. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

years, and having chest pain with lifting or with stress. Upon examination, Dr. Ruwitch diagnosed plaintiff with coronary artery disease, severe lipid disorder, and recurrent SVT. A holter monitor was prescribed, and a stress test was ordered. (Tr. 478-80.)

Plaintiff visited Dr. Pachalla at Grace Hill on May 9, 2011, and complained of having joint pain in her elbows, ankles, and pelvis; headaches; and depression with anxiousness, fearful thoughts, poor concentration, sleeplessness, and depressed mood. Physical examination was unremarkable. Plaintiff was prescribed Amitriptyline for headaches[6] and was referred for counseling. Plaintiff was also prescribed Valium, Trazodone, Metoprolol, and Lipitor. (Tr. 497-500.)

Plaintiff underwent a stress test on June 8, 2011, which showed small to moderate perfusion abnormality of mild severity present in the anterior and inferior walls. It was noted that ventricular systolic function was normal without regional wall motion abnormalities. Overall, the stress test was determined to be normal. (Tr. 471-73.) The results of holter monitor testing showed normal rate variability. (Tr. 474.)

On June 17, 2011, plaintiff visited Anita Tsay, MSW, LCSW, at BJC Behavioral Health with complaints of lashing out when angry, suicidal thoughts when depressed, panic attacks, sleep disturbances, and crying spells. Plaintiff reported having periods of depression since she was eighteen years of age after her uncle's suicide. Plaintiff also reported that she was previously involved in a violent relationship and that her youngest daughter had been sexually molested by her mother's boyfriend. Plaintiff reported having depression and anxiety most of her life but that her symptoms recently worsened when she lost her job. Plaintiff reported that she also has had panic attacks once a month for about two years. Plaintiff reported going to the emergency room during such attacks because she thinks she is having a heart attack. Plaintiff also reported having recently heard voices telling her to harm herself. Ms. Tsay diagnosed plaintiff with major depressive disorder, recurrent, severe without psychotic features; panic disorder with agoraphobia; and anxiety disorder. A Global Assessment of Functioning (GAF) score of 45 was assigned,[7] and an appointment was made with a psychiatrist. (Tr. 423-28.)

---

[6] Amitriptyline is also used to treat symptoms of depression. *Medline Plus* (last revised Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html>.

[7] "According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.

Plaintiff visited Dr. Rachel Morel, a psychiatrist, on June 30, 2011, for evaluation. Plaintiff reported being depressed and that her condition worsened within the past month after being fired from her job for excessive absences. Plaintiff reported being afraid to leave her house, having daily crying spells, and having paralyzing anxiety. Plaintiff reported her fears began about five years prior when her son's friend was found shot to death on her mother's doorstep. Plaintiff also reported being molested as a child. Plaintiff reported current feelings of worthlessness, guilt, and hopelessness. Plaintiff reported having called EMS because of heart attack symptoms but that she was actually having panic attacks. Dr. Morel noted plaintiff's current medications to include Valium and Trazodone. Mental status examination showed plaintiff to be goal directed and to have a logical thought process. Plaintiff's mood was depressed and her affect was tearful. Plaintiff denied any suicidal or homicidal ideations. Plaintiff's insight and judgment were fair, and Dr. Morel determined plaintiff had an average intelligence. Dr. Morel diagnosed plaintiff with major depressive disorder, recurrent, severe without psychosis; and panic disorder with agoraphobia. A GAF score of 35 was assigned.[8] Plaintiff was instructed to discontinue Valium and Trazodone, and Klonopin[9] and Remeron[10] were prescribed. Plaintiff was instructed to return in two weeks. (Tr. 420-22.)

Plaintiff visited Dr. Pachalla at Grace Hill on July 12, 2011, with complaints of depression, arthritis pain in her ankles, and heel pain. Dr. Pachalla noted plaintiff was seeing a psychiatrist for her depression. Plaintiff was diagnosed with plantar fasciitis and was instructed

Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" *Hudson v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, *Hurd v. Astrue*, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). DSM-IV-TR at 34.

[8] A GAF score between 31 and 40 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work). DSM-IV-TR at 34.

[9] Klonopin is used to relieve panic attacks. *Medline Plus* (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html>.

[10] Remeron is used to treat depression. *Medline Plus* (last revised Feb. 15, 2013)<http://www.

to exercise and apply ice to the affected area. (Tr. 491-93.)

Plaintiff returned to Dr. Morel with her case manager on July 25, 2011,[11] and reported some improvement but that she continued to feel anxious and angry. Plaintiff reported that her fiancé sometimes leaves to get a break from her ranting. Plaintiff reported wanting to get better but that it was difficult because of her anger. Dr. Morel increased plaintiff's dosage of Remeron. (Tr. 417-19, 422.)

On August 8, 2011, plaintiff visited Dr. Morel and reported that her mood and anxiety were not responding to the medications. Plaintiff reported increased anxiety because of her anticipated eviction. Plaintiff reported that she recently got a job as a cafeteria worker because of her need to pay rent, but was worried about her mood with such work. Mental status examination report showed plaintiff was disheveled in appearance. Plaintiff was cooperative. Plaintiff's mood was self-described as "horrible" and her affect was labile. Plaintiff was alert and oriented times four. She was noted to be fidgety. Dr. Morel noted that plaintiff needed medication management to quickly stabilize her mood given her upcoming job. Remeron and Klonopin were discontinued and Lexapro,[12] Valium and Abilify[13] were prescribed. Plaintiff was instructed to return in one week. (Tr. 414-16, 419.)

During a telephone call on August 15, 2011 Dr. Morel noted plaintiff was having a panic attack with tremor. Plaintiff reported that she had her first day of work, which went fine until her boss told her to come in earlier than scheduled. Dr. Morel noted plaintiff calmed down while talking on the telephone. An upcoming appointment was noted. (Tr. 416.)

Plaintiff visited Dr. Morel on August 18, 2011 and reported mild improvement but that she continued to have crying spells. Plaintiff reported being able to handle work and that she had not had a panic attack since her first day. Mental status examination showed plaintiff alert and oriented times four. Plaintiff's appearance was fair and she was noted to be cooperative.

---

nlm.nih.gov/medlineplus/druginfo/meds/a697009.html>.

[11] Plaintiff's case manager accompanied plaintiff to this and each subsequent visit to Dr. Morel.

[12] Lexapro is used to treat depression and generalized anxiety disorder. *Medline Plus* (last revised Apr. 13, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html>.

[13] Abilify is used to treat the symptoms of schizophrenia, episodes of mania or mixed episodes in bipolar disorder, and depression when symptoms cannot be controlled by an antidepressant alone. *Medline Plus* (last revised May 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html>.

Plaintiff's mood was self-described as "terrible" and her affect was tearful. Dr. Morel determined increased her Lexapro for its anti-anxiety effects. Plaintiff's dosage of Abilify was also increased to help with irritability and hopelessness. Trazodone was prescribed for sleep. Plaintiff was continued on Valium. (Tr. 410-11, 413.)

Plaintiff returned to Dr. Morel on September 1, 2011, and reported decompensation since her last visit with decreased sleep, increased anxiety, and worsening irritability relating to her receiving an eviction notice. Plaintiff reported the Trazodone to make her more tired but that it did not help her fall asleep. Plaintiff reported that her job was great and that she wished she could be there more than at home. Plaintiff reported her anxiety increased after about four hours of work, which prevented her from working full time. Plaintiff's mental status was unchanged. Plaintiff's dosage of Trazodone was increased. (Tr. 407-09, 412.)

On September 19, 2011 plaintiff reported to Dr. Morel that she was extremely depressed and felt that her medications were not working. Plaintiff reported that she moved back in with her mother and was more angry and irritable. Plaintiff was hopeful that her new job would become long term and help her get back on her feet. Plaintiff reported that she stopped taking Abilify because of gastrointestinal distress. Plaintiff also reported adjusting her medication dosages helped her calm down during the day. Dr. Morel discontinued Valium because of concerns that plaintiff was becoming addicted to the medication. Trazodone was increased and Abilify was discontinued. Plaintiff was instructed to continue with her other medications. Plaintiff was referred for counseling. (Tr. 404-06, 409.)

Plaintiff returned to Dr. Morel on October 3, 2011, and reported continued struggles. Plaintiff reported having a low mood and continued trouble with sleep but that her anxiety had improved with an increase in Trazodone. Mental status examination showed plaintiff was cooperative and well groomed with fair eye contact. Plaintiff was tearful. Plaintiff's thought process was goal directed and logical, and her insight and judgment were fair. Therapy was recommended, but plaintiff requested that housing be secured before beginning therapy. Dr. Morel continued in her diagnoses of major depressive disorder, recurrent, severe; and panic disorder. Plaintiff was also continued in her GAF score of 45. Plaintiff was instructed to continue with her current medications. (Tr. 400.)

Plaintiff returned to Dr. Pachalla at Grace Hill on October 11, 2011, and complained of worsening right ankle pain and reported that it was difficult for her to walk. Plaintiff reported

the pain worsened with climbing stairs, movement, walking, and standing but that aspirin, elevation, and heat relieved the pain. Plaintiff reported that wearing a brace also helped. Plaintiff also complained of mild back pain as well as wrist and elbow pain. Physical examination showed severe pain about the right foot and ankle with reduced range of motion about the left ankle. It was noted that plaintiff could bear weight but with significant pain. Plaintiff was prescribed Vicodin[14] and was instructed to use crutches and follow up with a foot doctor. X-rays were ordered. (Tr. 485-87.)

On October 31, 2011, plaintiff visited Dr. Morel and reported no change. Plaintiff reported that she stopped taking Lexapro because of diarrhea. Plaintiff's mood was okay, but she reported continued anxiousness while living with her mother. Plaintiff reported doing well with her job and that she was happy with that circumstance. Plaintiff reported feeling no depression or anxiety while at work. Mental status examination showed plaintiff's mood was euthymic. Lexapro was discontinued, and Cymbalta[15] was prescribed. Plaintiff was instructed to continue with her other medications as prescribed. (Tr. 398.)

Plaintiff returned to Dr. Morel on January 11, 2012, and reported doing okay. Plaintiff reported having daytime sedation with Trazodone. Plaintiff also reported having side effects with Cymbalta, and Dr. Morel prescribed Zoloft instead.[16] Seroquel was also prescribed.[17] Dr. Morel noted plaintiff was tearful, and plaintiff reported having had a meltdown at work when her boss wanted to assign her more responsibility. Dr. Morel continued in her diagnoses of major depressive disorder and panic disorder, as well as her GAF score of 45. Dr. Morel informed plaintiff of her upcoming transfer to another facility, upon which plaintiff became emotional but was understanding. (Tr. 396.)

---

[14] Vicodin is used to relieve moderate to severe pain. *Medline Plus* (last revised May 15, 2013) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

[15] Cymbalta is used to treat depression and generalized anxiety disorder. *Medline Plus* (last revised July 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

[16] Zoloft is used to treat depression, obsessive-compulsive disorder, post-traumatic stress disorder, and social anxiety disorder. *Medline Plus* (last revised Apr. 13, 2012)<http://www. nlm.nih.gov/medlineplus/druginfo/meds/a697048.html>.

[17] Seroquel is used to treat the symptoms of schizophrenia, bipolar disorder, and depression. *Medline Plus* (last revised Apr. 15, 2014)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a698019.html>.

On February 8, 2012, plaintiff reported no changes to Dr. Morel. Plaintiff reported that her sleep and her mood were okay. Dr. Morel noted plaintiff was tearful. Mental status examination was otherwise unremarkable. Plaintiff was instructed to increase her dosage of Seroquel. Dr. Morel continued her diagnoses and GAF score. (Tr. 397.)

Plaintiff visited Dr. Manikant Desai, a psychiatrist, on March 5, 2012. Dr. Desai noted plaintiff's history included depression, anger, and panic attacks. Dr. Desai diagnosed plaintiff with bipolar disorder and panic disorder and assigned a GAF score of 50. Plaintiff was prescribed Cymbalta, Lamictal,[18] Topamax,[19] and Seroquel, and was instructed to return in two weeks. (Tr. 507-08.) On March 20, plaintiff reported to Dr. Desai that she felt okay but tired. Plaintiff was instructed to decrease her dosage of Seroquel. (Tr. 506.)

Plaintiff returned to Grace Hill in April 2012 with complaints of bilateral foot pain about the heel, aggravated by walking and standing. Podiatrist John Harness noted plaintiff walked with an antalgic gait with partial weight bearing on the left side using crutches. Dorsiflexion of the ankles was noted as limited, bilaterally. Palpation and compression were painful. Plaintiff was diagnosed with plantar fascial fibromatosis, and an injection of lidocaine was administered. Plaintiff was instructed to rest, reduce her activity, elevate her feet, stretch, apply ice, and obtain arch supports. (Tr. 482-84.)

Plaintiff visited Dr. Desai on April 25, 2012, who noted plaintiff was nervous and upset. Plaintiff reported that she was scared because she would be out of a job after the school year. Plaintiff was panicky and anxious. Plaintiff also reported that she had been yelling and screaming. Plaintiff was instructed to increase her dosage of Topamax. (Tr. 505.)

On May 14, 2012, plaintiff returned to Grace Hill and reported that her heel pain was worsening. (Tr. 481.)

On May 30, 2012, plaintiff reported to Dr. Desai that she was depressed and had crying spells. Plaintiff reported her mood was "up and down." Plaintiff reported that she was not

---

[18] Lamictal is used to increase the time between episodes of depression, mania, and other abnormal moods in persons with bipolar disorder. *Medline Plus* (last revised Feb. 1, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html>.

[19] Topamax is used to treat certain types of seizures and to relieve the pain of migraine headaches. *Medline Plus* (last revised May 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html>.

currently working. Dr. Desai instructed plaintiff to increase her dosage of Seroquel. (Tr. 504.)

In a letter dated June 4, 2012, Dr. Harness wrote that plaintiff's activity was restricted to no prolonged standing or other ambulatory activity, and that she could not return to work until August 2012. (Tr. 511.)

In a Mental Medical Source Statement (MMSS) dated June 11, 2012, Dr. Desai opined that, in the domain of Understanding and Memory, plaintiff was markedly limited in her ability to remember locations and work-like procedures, and in her ability to understand and remember detailed instructions. Plaintiff was opined to be moderately limited in her ability to understand and remember very short and simple instructions. In the domain of Sustained Concentration and Persistence, Dr. Desai opined that plaintiff was extremely limited in her ability to maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruption from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was opined to be markedly limited in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and sustain an ordinary work routine without special supervision; and moderately limited in her ability to carry out very short and simple instructions, and make simple work-related decisions. With Social Interaction, Dr. Desai opined that plaintiff was markedly limited in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; and moderately limited in her ability to ask simple questions or request assistance. With Adaptation, plaintiff was opined to experience marked or extreme limitations in all areas, including extreme limitations in responding appropriately to changes in the work setting. (Tr. 509-10.)

## IV. The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since January 24, 2011, the date of application for SSI.[20] The ALJ found plaintiff's anxiety disorder,

---

[20] The ALJ noted that plaintiff's earnings from her work in the school cafeteria were below the level required for such work to be considered substantial gainful activity.

tachycardia, obesity, and plantar fasciitis were severe impairments, but that she did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-17.)  The ALJ found that plaintiff had the RFC to perform light work except that she was

> limited to 20 pounds occasional and ten pounds frequent lifting/carrying; with an option to sit/stand as needed and to change positions at will; occasional climbing of ramps and stairs; no climbing of ropes, ladders, and scaffolds; occasional stooping, crouching, and kneeling; need to avoid concentrated exposure to unprotected heights; with the ability to understand, remember, and carry out at least simple instructions and non-detailed tasks, adapt to routine/simple work changes, and perform work at a normal pace without production quotas.

(Tr. 17.)  The ALJ determined plaintiff was unable to perform any of her past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ decided that the vocational expert testimony indicated that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, school bus monitor and children's attendant.  The ALJ therefore found that plaintiff was not disabled after January 24, 2011.  (Tr. 20-22.)

## V.  Discussion

To be eligible for SSI under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful

activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner decides whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

In this action, plaintiff argues that the ALJ improperly weighed the opinion evidence rendered by her treating psychiatrist, Dr. Desai. Plaintiff also contends that the ALJ's RFC findings are not based upon any medical evidence and that the ALJ failed to cite to any medical evidence to support the findings. For the following reasons, the matter will be remanded for further proceedings.

After finding at Step 3 of the sequential analysis that plaintiff's impairment did not meet the criteria for listing level disability, the ALJ assessed her RFC. A claimant's RFC is the most she can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001). As such, the ALJ must "consider at least some supporting evidence from a [medical professional]" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. *Hutsell*, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. *Id.*

A review of the ALJ's RFC analysis here shows it consists only of discrediting plaintiff's subjective complaints and discrediting the medical evidence of record, including evidence of emergency room visits, Dr. Desai's June 2012 MMSS, and BJC Behavioral Health's GAF scores. Other than discrediting plaintiff's subjective complaints and this medical evidence of record, the ALJ engaged in no discussion or analysis of any evidence as it related to plaintiff's RFC, that is, what she is able to do despite her impairments. Drawing a conclusion regarding credibility is not equivalent to demonstrating by medical evidence that a claimant has the RFC to perform certain work-related activities. *Estabrook v. Apfel*, 14 F. Supp. 2d 1115, 1122 (S.D. Iowa 1998), *cited approvingly in Graham v. Colvin*, No. 4:12-cv-00863-SPM, 2013 WL 3820613, at *7 (E.D. Mo. July 23, 2013) (memorandum opinion). Instead, the ALJ's RFC assessment must discuss and describe how the evidence *supports* each conclusion and must cite specific medical facts and nonmedical evidence in doing so, as well as resolve any material inconsistencies or ambiguities in the evidence of record. Soc. Sec. Ruling (SSR) 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin. July 2, 1996). The ALJ failed to engage in this process here. In the absence of any thoughtful discussion or analysis by the ALJ, this Court would be required to weigh the evidence in the first instance or review the factual record *de novo* in order to find whether the ALJ's RFC assessment is supported by substantial evidence on the record as a whole. This the Court cannot do. *See Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

Instead of looking to medical evidence to support his RFC determination, the ALJ appeared to rely heavily on plaintiff's performance of part-time work as a cafeteria helper in finding plaintiff had the RFC to perform work-related activities. In his RFC analysis, the ALJ repeatedly referred to this work, noting that plaintiff was "working regularly" and was able to "sustain[] employment . . . throughout the school year," and that such work demonstrated plaintiff being "quite functional" and having an "ability to work." (Tr. 19.) While part-time work can be considered substantial activity under 20 C.F.R. § 416.972(a) and may be relevant to the credibility of a claimant's subjective claims that she is unable to work, *see Goff*, 421 F.3d at 792, only a claimant's ability to perform *full time* work will permit an ALJ to render a decision of not disabled. *Bladow v. Apfel*, 205 F.3d 356, 359 (8th Cir. 2000). In addition, if a claimant performs work under special conditions – such as requiring and receiving special assistance from coworkers in performing the work, or being allowed to take frequent rest periods – the ability to perform such work does not necessarily show that the claimant is able to perform substantial

activity. 20 C.F.R. § 416.973(c).

Here, while the ALJ emphasized in his RFC analysis that plaintiff was able to work as a cafeteria helper, his decision does not reflect that he considered whether plaintiff was able to do so because of special accommodations or conditions provided on the job. The record shows that plaintiff's coworkers permitted her to sit and take breaks because they understood her problems and knew that her feet hurt. The record also shows that plaintiff periodically left her duty station to call her case manager or to take medication. In addition, plaintiff reported to her first treating psychiatrist, Dr. Morel, that her anxiety heightened after about four hours of work; and the record shows that plaintiff experienced an exacerbation of anxiety symptoms when a change in work routine was proposed, such as a change in hours or a change in responsibility. A review of the evidence of record *in toto* suggests that plaintiff may have worked under special conditions and in circumstances not conducive to an RFC finding that she had the "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis[,] . . . mean[ing] 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (defining RFC). As noted above, however, the ALJ did not address this circumstance.

Also, the ALJ's RFC analysis fails to cite any credited medical evidence that addresses plaintiff's ability to perform work-related activities on a regular and continuing basis, rendering the decision unclear as to the medical basis, if any, for the ALJ's assessment of the degree to which plaintiff's impairments affect her RFC. *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001); SSR 96-8p, 1996 WL 374184, at *7. Because the ALJ must articulate the medical and other evidence upon which he bases his RFC determination, and he failed to do so here, it cannot be said that the RFC determination is supported by substantial evidence on the record as a whole.

Nor can it be said that the ALJ's determination to accord no weight to Dr. Desai's June 2012 MMSS is supported by substantial evidence on the record as a whole. The opinion of a treating physician is accorded special deference under the Regulations and is normally entitled to great weight. *Vossen,* 612 F.3d at 1017; 20 C.F.R. § 416.927(c)(2). Although a treating physician's opinion should not ordinarily be disregarded, *Jenkins v. Apfel*, 196 F.3d 922, 924-25 (8th Cir. 1999), an ALJ may discount or disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where the physician renders inconsistent opinions that undermine their credibility. *Anderson v. Astrue*, 696

F.3d 790, 793 (8th Cir. 2012). Inconsistency with other substantial evidence alone is a sufficient basis upon which to discount a treating physician's opinion. *Goff,* 421 F.3d at 790-91. The ALJ must "always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. § 416.927(c)(2).

Here, the ALJ disregarded Dr. Desai's opinions and accorded them no weight, finding them to be "grossly exaggerated," inconsistent with record evidence and his own treatment notes, based on only four visits in a three-month period, and conclusory. These reasons do not provide a sound basis to disregard this treating psychiatrist's opinions in their entirety.

The ALJ first states that Dr. Desai's opinions are "grossly exaggerated" inasmuch as a person with such limitations would likely be hospitalized. (Tr. 19.) However, an "ALJ's reliance on . . . his own beliefs as to what the medical evidence should show do[es] not constitute substantial evidence" to support a conclusion that a claimant has the RFC to perform work-related activities. *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989). The medical evidence here shows plaintiff had visited hospital emergency rooms on at least nine occasions in an eight-month period with symptoms consistent with what emergency room personnel considered to be an anxiety disorder. Plaintiff's emergency room visits did not cease until she began receiving consistent psychiatric treatment from Dr. Morel and Dr. Desai; but even with such treatment, plaintiff continued to exhibit symptoms determined by these psychiatrists to be indicative of serious or major impairments in functioning. Throughout her treatment, plaintiff remained tearful with continued anxiety and depression, and medication management provided little relief as demonstrated by repeated changes and adjustments to plaintiff's psychotropic medications.

This evidence likewise shows that Dr. Desai's opinions were not so inconsistent with other substantial medical evidence of record such that his opinion should be disregarded. Dr. Desai's observations and treatment of plaintiff are consistent with that of Dr. Morel, whom plaintiff visited on no less than ten occasions in the eight-month period immediately preceding Dr. Desai's assumption of her psychiatric care. With Dr. Desai, plaintiff received medication for bipolar disorder but nevertheless continued to exhibit panicky and anxious symptoms, with crying spells and periods of yelling/screaming noted. As with Dr. Morel, plaintiff exhibited a transient response to the medication regimen prescribed by Dr. Desai, with changes and adjustments continuing to be made.

Likewise, given the consistency of plaintiff's symptoms and her ineffective response to

the treatment rendered by her treating psychiatrists – with the totality of such treatment, on this record, spanning twelve months – the ALJ's statement that Dr. Desai's three-month treatment of plaintiff provided an insufficient basis to demonstrate that her diagnosed conditions would continue at the rated severity for twelve months (Tr. 20) is not supported by the record.

Finally, the ALJ accorded no weight to Dr. Desai's opinions for the reason that they were made in conclusory fashion in a checklist and were not consistent with his own treatment notes. (Tr. 20.)  While opinions expressed in checklist format have little evidentiary value when they are accompanied by no elaboration or citation to medical evidence for support, *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010), such opinions should not be disregarded in their entirety on this basis when other medical evidence supports their conclusions.  *Cf. Johnson v. Astrue*, 628 F.3d 991, 994-95 (8th Cir. 2011) (ALJ may discount conclusory opinions in checklist MSS if contradicted by other objective medical evidence in the record).  Further, the ALJ's reliance on the MMSS's purported inconsistency with Dr. Desai's treatment notes does not constitute a good reason to disregard this opinion evidence given the ALJ's previous finding that "Dr. Desai's handwritten notes are largely illegible[.]"  (Tr. 15.)  *See Shackleford v. Astrue*, No. 4:10CV2175 AGF, 2012 WL 918864, at *10 (E.D. Mo. Mar. 19, 2012) (duty to develop record may include seeking clarification from treating physician if portions of medical record that are crucial to plaintiff's claim are illegible); *McBeth v. Astrue*, No. 08-CV-05097-NKL, 2009 WL 3834798, at *7 (W.D. Mo. Nov. 13, 2009) (ALJ not free to discount treating physician's opinion when physician's treatment notes were illegible and ALJ failed re-contact physician for clarification).

There are no other medical assessments in this record that are supported by better or more thorough medical evidence to justify disregarding Dr. Desai's opinions.  Nor did Dr. Desai render inconsistent opinions such that their credibility is undermined.  Nor does the record show that Dr. Desai's opinions are  inconsistent with other substantial evidence to such a degree that his opinions should be disregarded in their entirety.  As such, it cannot be said that the ALJ's decision to accord no weight to the opinions expressed in Dr. Desai's June 2012 MMSS is supported by substantial evidence on the record as a whole.

Therefore, for all of the foregoing reasons, this matter must be remanded for further proceedings.  The ALJ on remand must reconsider the weight given to the opinions of Dr. Desai in light of the totality of the evidence of record.  *Vossen,* 612 F.3d at 1017.  If additional

information directly related to Dr. Desai's medical opinion is needed for such reconsideration, the ALJ is permitted to re-contact Dr. Desai in order to resolve any inconsistency or insufficiency in the evidence received from him.  77 FR 10651-01, at *10652, 2011 WL 7404303 (Soc. Sec. Admin. Feb. 23, 2012).  The ALJ is also permitted to order medical examinations and tests in order for him to make an informed decision regarding the extent to which plaintiff's physical and mental impairments, both severe and non-severe, affect her ability to perform work-related activities.  *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985); 20 C.F.R. § 416.917.  Upon receipt of any such additional information, the ALJ shall reconsider the record as a whole, including the medical and nonmedical evidence of record as well as plaintiff's own description of her symptoms and limitations, and reassess plaintiff's RFC.  Such reassessed RFC shall be based on substantial medical evidence in the record and shall be accompanied by a discussion and description of how the evidence supports each RFC conclusion.  *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); SSR 96-8p, 1996 WL 374184, at *7.

## VI.  Conclusion

For the reasons set forth above, the Commissioner's decision is not supported by substantial evidence on the record as a whole.  The decision of the Commissioner is therefore reversed under Sentence 4 of 42 U.S.C. § 405(g) and this case is remanded for further proceedings consistent with this opinion.  Because the current record does not conclusively demonstrate that plaintiff is disabled, it would be inappropriate for the Court to award plaintiff benefits at this time.

An appropriate Judgment Order is issued herewith.


_____/S/   David D. Noce_____
UNITED STATES MAGISTRATE JUDGE


Signed February 17, 2015.